It pleases the court. On behalf of the United States, I ask the court to reverse remand to the district court a sentence which includes, in the government's view, two legal provisions. First, a three-level downward departure based upon defendant Carey and then the district court, in its judgment, directed that that fine be paid to a source not authorized by statute. This case relieves, first, on the aberrant departure, this case is about mandatory sentences should have been one of mandatory imprisonment that went to a sentence of no imprisonment and the facts of course deal with 75 pounds of marijuana that were subject to the importation and the possession with the intent to distribute charges. Pursuant to the amendments made by the Sentencing Commission to 5K2.20 in late 2000, district court's got to make four findings and this has recently been reaffirmed or restated by this court in United States v. Guerrero. First, district court's got to find that a case constitutes an extraordinary case. No such finding was made by this district court, nor could such a finding have been made as set forth in the briefing given the facts of the case. Did you object to that, that they did not find it extraordinary? No, there is not a... It's not waived. Well, I don't believe it is waived because of the fact that the district court has got to make those four findings. I mean, the fact that this is an adversary process, you're there, did you represent the government? No, I... You're Mr. Mercer? I am. Well, whoever represented, did not object. Why isn't it a waiver? Well, the government did make an objective, I'll refer to the court to the excerpts of record at 118, and the first objection made there states that drug or alcohol dependence or abuse is not a reason for imposing a sentence below the guidelines. That deals with the fourth prong that I'll get to in a minute. Then the government made an objection dealing with the fact that, the fact that I don't see that his drug or alcohol abuse constitutes any extraordinary situation here. Then the government made a further objection based upon... What you just read, you're saying is an objection? Finally, I don't see that his drug or alcohol abuse constitutes any extraordinary situation here. This is all part of the colloquy. That was the government attorney who said that? Right, and it's set forth at page 118 in the excerpts of record. So he's objecting to a particular fact. What's the third objection? Well, then the third objection goes to the other two prongs, of course. I don't see the objection made, this is not an extraordinary case you're on. Well, the specific language that he cites here, the quote is, factually, I don't see that his drug or alcohol abuse constitutes any extraordinary situation here. Who said it did? I'm sorry, Your Honor? Who said that it did? This is Assistant U.S. Attorney Vanda Wettering who's making a statement to the Court. Yes, but who is he objecting to when he says that? Well, he's using the language extraordinary and he's talking about... I'm asking you, to whom is he objecting when he says drug or alcohol is not extraordinary? Who has said that it is extraordinary? The Court had called on him, Your Honor, to talk about the departure being sought by Mr. Carey and that's... Maybe he hit on a point that wasn't relevant. Maybe that was not the relevant point. Well, he also objected, Your Honor, on the fact that this was committed without significant planning. That's another point, but it seems to me you waive the extraordinary point. Well, Your Honor, I... You didn't waive it as to the drug or alcohol addiction didn't make it extraordinary. I agree with you. You made that point. And the circumstances of the case, of course, are directly related to that. I think it's extraordinary. I'll only tell you my take on it. Somebody was basically a man from Chicago in the middle of winter has the fantasy that he can go up to the middle of Montana and successfully smuggle marijuana. It's a crazy scheme. He was living in Missoula at the time, Your Honor. I don't know that. Well, it's in the PSR and if the Court wishes me to give that citation, I'd be happy to do so. He'd moved to Missoula, Montana, having left Colorado. He'd been living, snowboarding in a ski resort town in Colorado for, I think, four years. Mr. Carey was not unfamiliar with the Rockies. He was not unfamiliar with snow. And he was attempting to bring 75 pounds of marijuana in, and I don't see how that constitutes an extraordinary circumstance. We specifically dealt with it there. We specifically talked about how this, when you're talking about the fact, the lifestyle, the fact that drug and alcohol abuse somehow meets the final prong, that this represents a marked deviation by the defendant from otherwise law-abiding life. He's talking about how he's used five different kinds of drugs. I think the real problem is that we don't really know what aspects of what was contained in the letters or the PSR or whatever that caused Judge Deloy, a very experienced and esteemed district court judge, to make the finding that this was an extraordinary case. Well, I believe the PSR has been filed a record for this Court's determination. There's a lot of facts in the PSR, and there's a lot of facts in the letter. And I'm not sure. You're saying that the government attorney objected to drug and alcohol. There's a lot of other stuff in there. Reading the record, I don't see that the counsel objected to the finding of the extraordinary case per se. But I also don't see the basis for Judge Molloy's finding. Well, I'm not sure what it is, because he didn't state specifically the characteristics of this particular defendant that he found made it an extraordinary case. Yeah. There aren't any findings to that extent at all, Your Honor. And, of course, specifically on the other two prongs that I haven't talked to, the fact that this was committed without significant planning, this required a flight to Missoula. It required renting a car. It required driving to the border, getting the drugs with an intention to bring them back. There was certainly significant planning. Where was he living, you say, in Montana? Missoula. But you said it required a flight to Missoula. Well, there was some sort of transportation that was involved. Well, wait a minute. Let me pin you down on this. You told me a little while ago he's living in Missoula. Well, that's Well, there was some trip involved to Arizona, Your Honor. You can't come and talk to the court. Some trip involved. You said a flight. What do you mean by a flight? Well, it's my understanding he had gone to Arizona and then returned to Montana, and I'd be happy to try to Return from where? From Arizona. No, you're really mixing this up. I mean, you tell us he was there all the time, then he's flying from Arizona. Right. Can you spell it out just a little detail? What did he do? If you'd allow me to, Your Honor, I'll do that during the rebuttal. I'll do that during the rebuttal if you'll allow me to, so I can give you the specifics in the PSR. Now, I want to ask you about your other point on the fine. Did you waive that as well? No objection was made, Your Honor, to the fine. The fine's not a waiver. It is not a waiver because it was an issue that was not – there wasn't a motion from the defendant. There wasn't any sort of warning, and based upon the authority that's been set forth in the brief, the government didn't waive Where's the government? Excuse me? I mean, the government doesn't realize that the fine has to go to the Victim's Crime Fund? Well, you know, it's never been something that had been done by a district court. Where's the government? Weren't they present at the time of the sentencing? Certainly, Your Honor. And you didn't hear what Judge Molloy said from the bench? Well, I don't think it was clear to that particular attorney that that was something that the court didn't have the authority to do, and then the review – Well, then they missed the point. They waived it. No. They didn't say anything. I would say you're only – you should be arguing plain error. What I'd like to know is what substantial rights were affected here? Well, the substantial rights of the fact that the Congress has made a determination that the only way that there can be adequate compensation for victims, both at the State and Federal level, is if there's a fund that allows for those governmental entities to provide that for victims. Well, you have a problem with the plain problem, too, because you just stood here and told us that the counsel representing the government of the United States didn't recognize at the time that it was error to give the fine to charity as opposed to the crime victims spent. And if your own lawyer didn't recognize there was an error, how could it be plain? Well, you know, Your Honor, if you look through the case law, as you probably have done, they're just simply this is not something that's discussed. I don't think there are any circumstances – This isn't discussed. I've never sentenced someone where if the government needed to make an objection, it failed to do so. I mean, it stood up and objected. I don't understand, you know, what the reason could be for your lawyer not standing up and objecting. Well, we're – we are arguing plain error, Your Honor. We're arguing that the law is very clear and that the court ignored and this is not something that is really reflected in the case. I don't think there are any district courts are diverting funds to non – to entities that aren't covered by the crime victims fund. The crime victims fund for a long, long time has been the only place where any kind of fine could go. And so – We have another case on this calendar here where the same sort of thing happens in the fund. I think this was – these funds were directed to the school district.  In the other case, they're directed to the – to the shelters. That's correct. If I remember correctly. But, you know, it looks like this is – it looks like this is something that was happening or has been going on and nobody's ever figured out that there might be a question about it? Well, I think those are the only two cases where this has ever happened. And, again, this is clearly not something that's reflected in a lot of appellate decisions. I don't believe that many courts have decided to take money that the government was entitled to for purposes of compensating victims and deciding to divert it to some other entity. It's just – it's plainly – it's plainly – Why is no remedy to sue the charity? Why are you pursuing a misappeal? Well, because as part of this Court's granted jurisdiction, this is an illegal sentence, and this – this Court – we're asking this Court to find that it was plain error and that, in fact, that that source was not entitled and that, therefore, that this judgment should be reversed. It's clearly within the granted jurisdiction because this has been imposed in violation of the law. And so this is our – this is our only remedy. Just one question. In this case, I understand the scenario here. Mr. Carey paid the fine to the clerk. That's correct. Do we know – did the clerk release the money to the school district? Do we know? I don't believe that – The funds are still there at the district court. I don't – I don't believe that that's the case, Your Honor, but I – Well, you think it would make a difference if the funds had been released? Mr. Carey certainly shouldn't have to pay it twice. Well, the – it's still an illegal sentence. The terms of the judgment are still illegal. Well, what can we do? Suppose the money's been released. What would it do to correct the sentence? Well, I think the district court would then have some sort of requirement to issue a follow-up order if, in fact, it was –  I don't think that would – Well, it's the government's position that the sentence is illegal and that the only remedy the government can have is to have that judgment reversed. There's a judgment out there that says – You do have the remedy of suing the charity. Well, certainly the charity believes that it's received that money pursuant to a lawful judgment of a district court. We want this court to say that it was plain error for the district court to have said that that money should go to another judgment. But shouldn't we go back to charity's rights without hearing the charity's argument? Well, in this – in this case, it's clear from the record counter the charity has no rights. I don't know about that. I mean, most lawsuits have two sides. Well, I think – These people have got some money and they have some argument that they can keep it. The statute's – the statute's clear that the only source of a fine – There are no cases where you can just say, I've got an open and shut case. You don't need to hear the other side, Your Honor. Well, I think this is one of them. You've got all kinds of clear language that the only source for a fine is the United States Treasury. If we start with a problem you didn't object, they might say, well, you waived it. Well, and if this Court finds, as the government hopes it will, that it was plain error, then that certainly will resolve any question, I think, in terms of what legitimate interest the charity might have. It would just begin a lawsuit. I'm sorry? It would just begin a lawsuit where you would try to get the money from back from the charity. Well, if this Court says that the judgment, as at least in part the fine, was illegal, then I don't think there's any question that the charity would not have any kind of standing to challenge that, because this Court would find that it was plain error under the law that the charity had no legitimate interest in that money because the only source was the crime victim fine. All right. Thank you, counsel. You're well over your time. Mr. Daniels. I guess I'll never get the itinerary from Arizona. Well, I'll be happy to do that for Your Honor, if you wish. Good afternoon, Your Honors. For the record, my name is Tony Gallagher, and I represent Peter Bernard Carey, Jr., Arizona. He came from Arizona to Missoula, rented a vehicle, and went up to the Riyak Valley, and he admitted to district court that he picked up approximately 75 pounds of marijuana. What makes this case extraordinary, what makes this case unique, what makes this case outside the heartland, is the fact that Peter Bernard Carey, and as Judge Wardlaw has already pointed out, this is a very experienced United States district judge, chief judge of the District of Montana, who found that there were extraordinary circumstances, although that word does not appear in his judgment, nor does it appear in his colloquy with Mr. Vander Wettering or with me during the course of the sentencing in this proceeding. But as this Court is well aware, certainly the Court can look at the record to see that in the PSR and in the sentencing memorandum and letters that were submitted to Judge Malloy, there is more than sufficient information to indicate that this is an extraordinary case. And I would direct the Court not only to the facts in the record, but also a case cited by the United States, Castano, which indicates in the government's opening brief, that's Castano, C-A-S-T-A-N-O, that the district court, this is what Castano says, the district court may consider the five factors in Application Note 2 to 5K2.20 in determining if the case is extraordinary. Those five factors, Your Honors, are the five factors that are evident, are replete in those letters that were submitted by Mr. Carey at the time of sentencing. Those five factors talk about his prior employment. They talk about his prior good works. They talk about how he, this particular offense has affected him. They talk about his motivation for committing the offense. All of these things militate in favor of Mr. Carey. Ginsburg, your argument is in an effort right now for us to supply findings that Judge Malloy didn't make. And in United States v. Guerrero, which might, I think it was after the sentencing, our court made it absolutely clear that the district court must make the separate inquiries on the record and make a determination both that the case is extraordinary and that it was aberrant. And in Guerrero, because the district court didn't make those findings, the sentence was vacated and remanded. Your Honor, I must admit that Judge Malloy did not give me the greatest record in the world to work with. But what is in the record? See, I guess what I'm suggesting is that if we have to vacate remand for findings, that the argument you're making now would more properly be made to Judge Malloy, because I would imagine that Judge Malloy would make the same finding that it's an extraordinary case based on the same facts that he considered important and determinative, just didn't articulate. Yes, Your Honor. And I do have to concede that he did not articulate them as well as I would like him  to articulate them. Was there any problem in giving him the opportunity to articulate them? I have no problem at all in giving him the opportunity to articulate them, but I was hoping we could avoid that. I think that what — and I find it somewhat constrained here to mention to the Court something that's outside the record, but I think it's obvious from the record, and that is Peter's doing great. I mean, he's not been revoked. He's not back in jail.  He's halfway through his period of probation. He paid the $5,000 fine. This is a real person we're dealing with here. And he's doing well. And I would just hate to see this case go back. Well, I think you could assume that we'll make it a comeback case here. The government should want to appeal it again, but I think Judge Malloy saw the situation. I have great respect for him. He saw the defendant. He made the ultimate decision, but he didn't know he had to make all these findings. I don't see why he can't do it. We would comply with our precedent. I certainly agree, Judge Noonan, that he probably will make those findings and will make an appropriate record. And if the government is going to go down this alley, they can come back here and tell us why he's wrong. On behalf of Mr. Cary, I would be glad to come back here again, although I've been here once already, and now this is the second time on behalf of Mr. Cary. And I just was hoping that, for Mr. Cary's sake, we could put some end to this today. Be that as it may — But Judge Noonan brought out a good point, which was whether or not the government made a proper objection. Well, that's another point I wanted to make. Judge Noonan did point out to Mr. Mercer that there was no proper objection. And then Mr. Newton — I mean, Mr. Mercer cited to the Court objections by Mr. Van der Wettering at page 118 of the excerpts of record. I'd like to point out to the Court that Mr. Van der Wettering was speaking to my request for an additional departure ground under 5H1.3 for mental and emotional conditions and his addiction and Peter's addiction. So it wasn't an objection to the aberrant behavior? It was not. At that point, it was the objection to the request for departure under 5H1.3. And I was making a Malley-type argument that a period of treatment in a treatment center rather than a period of time in a prison setting would be an appropriate departure ground. Judge Malloy disagreed with that. So do you think that they ever laid out their general objections to the aberrant behavior? Not to the aberrant behavior, Your Honor. And we discuss in our brief extensively Leyva-Franco. And in Leyva-Franco, which are facts somewhat similar to the ones we have here when we talk about making an extraordinary finding and then making again the three-prong test under aberrant behavior, what's so strikingly dissimilar between this case and Leyva-Franco is that the government made specific and constant objections and demanded a ruling under Rule 32, which never happened here. The government did not file an objection to the pre-sentence report writers, draft report. The government did not file an objection to my sentencing memorandum, nor did it challenge the facts that were in my sentencing memorandum. And the only time I knew that the government was going to object was when Mr. Vander Wettering stood up at the time of sentencing and said, we object. Before that time, I had no indication on the record that there was going to be an objection to the arguments that I was making in support. What did the PSR say about the aberrant behavior? Did it say it was permissible? Mr. Piskulich said it was permissible. He also mentioned in Part E of the PSR that these were things that I was raising and they could be considered by the Court. And I think there were three or four reasons I raised. Did the government object to that aspect of the PSR? No, Your Honor. He did not. The government, as a matter of fact, said that they accepted the facts in the PSR and accepted the facts that they accepted the PSR as accurate. Now, by that time, I had already submitted a sentencing memorandum with letters in support of Mr. Carey's departure grounds. And the government did not posit an objection to those either. Your Honors, I would like to agree. What's your position on the fine? Thank you, Judge Files. That's exactly where I was going. I believe that the government has waived any objection to that. If this Court finds that they did not waive their objection to the disbursement of the fine, I'd like the Court to also look at the authority of this Court to consider this sentence at all, consider this argument at all under 3742. The government is not arguing how the sentence was imposed. The $5,000 fine is certainly within the guideline range. The $5,000 fine, as a matter of fact, is within the guideline range, whether they're correct on the aberrant behavior or not. They claim it's an illegal sentence or an unlawful sentence. If it's an unlawful sentence, where is it unlawful? The $5,000 goes to the clerk of the Court. The $5,000 is the fine. How it's dispersed is not within 3742. They're saying an illegal sentence on the sentencing guidelines. If it's illegal because of the way it was dispersed, the government's argument is not with Mr. Carey. Mr. Carey doesn't have a dog in this fight. Oh, that's correct. The argument is the sentence actually read, pay to the clerk of court $5,000. Pay to the clerk of court $5,000 to be dispersed to the Missoula County school system, Ms. Marianne Dolan, for the purpose of drug education programs in the high school system in Missoula County. That's what it says. Likewise, in Gazda, the Court ordered that it be sent to a shelter there. It was at a charitable reason. Now, that's the disbursement of the fine, not the imposition of the fine. Your Honors, the ---- In the judgment itself, what does it say that it shall be dispersed to the school? Your Honors, if you would, please. I believe it's on the government's excerpt from the record, page 137. The defendant shall pay a fine of $5,000 within 90 days of this judgment to the clerk of this court. The monies received as payment of this fine shall be utilized for drug education programs within Missoula County. So the judgment is to be ---- the $5,000 was paid to the clerk of the court. So, as I was saying to Judge Paez, we don't have a dog in this fight. If the government wants that $5,000 back, they've got to sue the United States District Court in Missoula County Public Schools, not Peter Paez. Do you know if the money has already been paid out? I do not know that, Judge. What I do know is that Peter paid his $5,000. And how would the check be made out to the U.S. Court? It was made out to the U.S. Court of ---- I believe it was made out to the United States of America. Yeah. But be that as it may, it was paid to the clerk of the court. And whether those funds have been dispersed, frankly, Judges, I have not looked into. I don't care. Well, I think the government's about to look into it and freeze them if it can. It may be true that they've freezed them in the Gazda case. And the Court asked that we consider the particular fine argument that Mr. Donahoe and I get together to enhance the argument with regard to the fine disbursement. We have done that. Mr. Donahoe indicates to me that Mr. Gazda has not paid the fine, although he was ordered to do so and certainly will be doing it. The fine is substantially larger. Substantially larger. $5,000 or something. And he has a substantially longer period of time to pay it. I know that I'm one ---- Over time. Much over time. Thank you, Judges, very much. Judge Newman's question, was it answered by counsel? I'm willing to wait. I don't know. Whatever you want to do. Do you have a quick answer? Quick answer on what? You don't get more time. You're way out of time. You said you were going to give me a generality. I was going to give you some sites, if I could. All right. Page 4, paragraph 43 of the PSR says that the defendant moved to Missoula, Montana, in 2000. There is, on paragraph 61, references to a dollar rental car rental in Missoula. There is reference to the fact that he had acquired a driver's license from Arizona on page 72 of the excerpts of record. And there is a discussion as part of argument at that motions hearing on page 106 about where he was from. There is nothing in the transcript that deals with the plane ticket. Thank you. Thank you, counsel. All right. U.S. v. Cary is submitted. We'll take U.S. v. Gosta. Good afternoon, Your Honors. If it pleases the Court, my name is Michael Donahoe. I'm an assistant federal defender with the Federal Defenders of Montana. I represent Mr. Gosta. I guess I'll work backwards and talk about the fine issue. Our reasons are very similar, if not exact. Replica of Mr. Gosta.
judges: Wardlaw, Paez, Noonan